**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Oral Phenylephrine Marketing and Sales Practices Litigation<br><br>This document relates to:<br><br>All actions. | Case No. 1:23-md-03089-BMC |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS THE INITIAL STREAMLINED CONSOLIDATED NEW YORK
<u>BELLWETHER CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

    A.    The Extensive Federal Regulatory Scheme for Over-The-Counter Drugs. ............ 2

    B.    After a Years-Long Monograph Process, the FDA Authorizes
          Phenylephrine as a Safe and Effective Nasal Decongestant. .................................. 4

    C.    The FDA Continues to Recognize Phenylephrine as Safe and Effective. ............. 6

    D.    Plaintiffs' Lawsuits. .............................................................................................. 7

ARGUMENT ..................................................................................................................... 9

I.    Federal Law Preempts Plaintiffs' State-Law Claims. ............................................ 9

    A.    Plaintiffs' State-Law Claims Are Expressly Preempted. ..................................... 10

          1.    The FDCA preempts state-law claims that seek to impose
                 requirements "different from or in addition to, or that [are]
                 otherwise not identical with" federal law. .................................................. 10

          2.    Section 379r bars Plaintiffs' claims because they are inconsistent
                 with the monograph. ................................................................................... 13

    B.    Plaintiffs' State-Law Claims Conflict with Federal Law and Are
          Preempted. ............................................................................................................ 17

          1.    Defendants cannot comply with federal law and Plaintiffs'
                 purported state-law obligations. ................................................................. 17

          2.    Plaintiffs' state-law claims impose obstacles to Congress's
                 purposes. ..................................................................................................... 19

II.    The RICO Claim Fails for at Least Two Independent Reasons ........................... 21

    A.    Plaintiffs Lack Statutory Standing to Assert the RICO Claim. ........................... 21

    B.    The RICO Claim Is Precluded by the FDCA ..................................................... 23

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
  823 F.3d 51 (2d Cir. 2016).........................................................................24, 25

*Apple Inc. v. Pepper*,
  587 U.S. 273 (2019)........................................................................................22

*Arizona v. United States*,
  567 U.S. 387 (2012)...................................................................................17, 19

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015)........................................................................................18

*Bates v. Dow Agrosciences LLC*,
  544 U.S. 431 (2005).......................................................................................20

*Bimont v. Unilever U.S., Inc.*,
  2015 WL 5256988 (S.D.N.Y. Sept. 9, 2015)...............................................12

*Bischoff v. Albertsons Cos., Inc.*,
  2023 WL 4187494 (S.D.N.Y. June 26, 2023) .............................................13

*Bowling v. Johnson & Johnson*,
  65 F. Supp. 3d 371 (S.D.N.Y. 2014).......................................................11, 17

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001).......................................................................................25

*Carter v. Berger*,
  777 F.2d 1173 (7th Cir. 1985) ......................................................................22

*Carter v. Novartis Consumer Health, Inc.*,
  582 F. Supp. 2d 1271 (C.D. Cal. 2008) .............................................10, 15, 21

*Colella v. Atkins Nutritionals, Inc.*,
  348 F. Supp. 3d 120 (E.D.N.Y. 2018) ..........................................................16

*Critcher v. L'Oreal USA, Inc.*,
  959 F.3d 31 (2d Cir. 2020)................................................10, 11, 12, 13, 14, 16

*Frei v. Taro Pharms. U.S.A., Inc*,
  443 F. Supp. 3d 456 (S.D.N.Y. 2020).........................................................19

*Geier v. Am. Honda Motor Co., Inc.*,
    529 U.S. 861 (2000) ..................................................................................................17

*Goldstein v. Walmart, Inc.*,
    637 F. Supp. 3d 95 (S.D.N.Y. 2022) ..............................................10, 11, 16, 20

*Gomez v. St. Jude Med. Daig Div. Inc.*,
    442 F.3d 919 (5th Cir. 2006) ....................................................................................21

*Gutterman v. Herzog*,
    2020 WL 6728787 (E.D.N.Y. Nov. 16, 2020) ......................................................21

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992) ..................................................................................................22

*Humana, Inc. v. Biogen, Inc.*,
    666 F. Supp. 3d 135 (D. Mass. 2023) ..................................................................22

*IBP, Inc. v. Alvarez*,
    546 U.S. 21 (2005) ....................................................................................................11

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ..................................................................................................22

*In re Insulin Pricing Litig.*,
    2019 WL 643709 (D.N.J. Feb. 15, 2019) ..............................................................23

*Jarman v. United Indus. Corp.*,
    98 F. Supp. 2d 757 (S.D. Miss. 2000) ..................................................................25

*Jovel v. i-Health, Inc.*,
    2013 WL 5437065 (E.D.N.Y. Sept. 27, 2013) ....................................................11

*Lester v. CVS Pharmacy, Inc.*,
    2024 WL 1312935 (S.D.N.Y. Mar. 27, 2024) ......................................................14

*Marentette v. Abbott Labs., Inc.*,
    886 F.3d 112 (2d Cir. 2018) ...............................................................................9, 17

*McCarthy v. Recordex Serv., Inc.*,
    80 F.3d 842 (3d Cir. 1996) ......................................................................................22

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ..................................................................................................17

*Mills v. Warner-Lambert Co.*,
    581 F. Supp. 2d 772 (E.D. Tex. 2008) ..................................................................15

*Murphy v. Nat. Collegiate Athletic Ass'n,*
   584 U.S. 453 (2018)........................................................................................................9

*Mutual Pharm. Co., Inc. v. Bartlett,*
   570 U.S. 472 (2013)........................................................................................17, 18, 19

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.,*
   710 F.3d 71 (2d Cir. 2013).............................................................................................3

*Norman v. Niagara Mohawk Power Corp.,*
   873 F.2d 634 (2d Cir. 1989).........................................................................................23

*O'Connor v. Henkel Corp.,*
   2015 WL 5922183 (E.D.N.Y. Sept. 22, 2015) ...........................................................11

*Palmer v. Trump Model Mgmt., LLC,*
   175 F. Supp. 3d 103 (S.D.N.Y. 2016)..........................................................................23

*Patora v. Vi-Jon, LLC,*
   2023 WL 5610300 (S.D.N.Y. Aug. 30, 2023) .............................................................13

*PLIVA, Inc. v. Mensing,*
   564 U.S. 604 (2011)...........................................................................................9, 18, 19

*POM Wonderful v. Coca-Cola Co.,*
   573 U.S. 102 (2014)........................................................................................23, 24, 25

*Poretsky v. Hirise Eng'g, P.C.,*
   2016 WL 5678880 (E.D.N.Y. Sept. 30, 2016) ...........................................................24

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
   579 U.S. 115 (2016)........................................................................................................9

*S & R Dev. Ests., LLC v. Town of Greenburgh, New York,*
   336 F. Supp. 3d 300 (S.D.N.Y. 2018)............................................................................9

*Sapienza v. Albertson's Companies, Inc.,*
   2022 WL 17404919 (D. Mass. Dec. 2, 2022) .......................................................12, 13

*Se. Laborers Health & Welfare Fund v. Bayer Corp.,*
   444 F. App'x 401 (11th Cir. 2011) ..............................................................................25

*Seale v. GSK Consumer Health, Inc.,*
   2024 WL 1040854 (C.D. Cal. Feb. 27, 2024)..................................................12, 15, 16

*Shepard v. Applebees's Int'l, Inc.,*
   2010 WL 1418588 (D. Kan. Apr. 7, 2010) .................................................................24

*Singo v. Ricola USA, Inc.*,
    2024 WL 196709 (S.D.N.Y. Jan. 18, 2024) .................................................................13, 21

*Solak v. Target Corp.*,
    2023 WL 5806326 (N.D.N.Y. Sept. 7, 2023) ...............................................................13, 15

*Sperber v. Boesky*,
    849 F.2d 60 (2d Cir. 1988)......................................................................................................22

*Town of Islip v. Datre*,
    245 F. Supp. 3d 397 (E.D.N.Y. 2017) ...................................................................................21

*Trisvan v. Heyman*,
    305 F. Supp. 3d 381 (E.D.N.Y. 2018) ...................................................................................19

*Trollinger v. Tyson Foods, Inc.*,
    370 F.3d 602 (6th Cir. 2004) ..................................................................................................22

*Utts v. Bristol-Myers Squibb Co.*,
    226 F. Supp. 3d 166 (S.D.N.Y. 2016)....................................................................................19

*Warren Gen. Hosp. v. Amgen Inc.*,
    643 F.3d 77 (3d Cir. 2011)......................................................................................................23

*Wegoland Ltd. v. NYNEX Corp.*,
    27 F.3d 17 (2d Cir. 1994).........................................................................................................25

*Wyeth v. Levine*,
    555 U.S. 555 (2009)..................................................................................................................18

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
    512 F. Supp. 3d 1278 (S.D. Fla. 2021) .................................................................................12

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
    546 F. Supp. 3d 1216 (S.D. Fla. 2021) ....................................................................21, 22, 23

*Zogenix, Inc. v. Patrick*,
    2014 WL 1454696 (D. Mass. Apr. 15, 2014) .......................................................................20

**Statutes**

21 U.S.C. § 331..................................................................................................................................3

21 U.S.C. § 333(a) ..........................................................................................................................18

21 U.S.C. § 352(a)(1).................................................................................................................1, 16

21 U.S.C. § 355h.......................................................................................................................3, 7, 20

21 U.S.C. § 379r ...................................................................................1, 4, 10, 12

The Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136,
134 Stat. 281 (2020).....................................................................................3

The Food and Drug Administration Modernization Act, Pub. L. No. 105-115,
111 Stat. 2296 (1997)...................................................................................4

**Regulations**

21 C.F.R. § 201.66(c).......................................................................................18

21 C.F.R. § 330.1 ...............................................................................3, 16, 18

21 C.F.R. § 330.10(a)...........................................................................3, 4

21 C.F.R. § 341.80.............................................................1, 5, 8, 14, 17, 18

21 C.F.R. § 341.85.............................................................................5

**Other Legislative Materials**

S. Rep. 105-43, 1997 WL 394244 (1997)...........................................12, 20

**Other Administrative Materials**

Establishment of a Monograph for OTC Cold, Cough, Allergy, Bronchodilator
and Antiasthmatic Products, 41 Fed. Reg. 38,312 (Sept. 9, 1976) ................4, 5

Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for
Over-the-Counter Human Use; Tentative Final Monograph for Over-the-
Counter Nasal Decongestant Drug Products, 50 Fed. Reg. 2,220
(Jan. 15, 1985).........................................................................................5

Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for
Over-the-Counter Human Use; Final Monograph for OTC Nasal Decongestant
Drug Products, 59 Fed. Reg. 43,386 (Aug. 23, 1994) ..........................5, 18

U.S. Food & Drug Admin., *FDA clarifies results of recent advisory committee meeting
on oral phenylephrine* (Sept. 14, 2023), *available at*: http://tinyurl.com/2tbhkvyf .............6, 7

U.S. Food & Drug Admin., *NDAC Briefing Document: Oral Phenylephrine in the
CCBA Monograph*, *available at*: https://tinyurl.com/2dk7248p............................................6

U.S. Food & Drug Admin., *Nonprescription Drugs Advisory Committee* (Feb. 16,
2023), *available at*: https://tinyurl.com/2s439zwk .......................................6

U.S. Food & Drug Admin., *The Current Status of Oral Phenylephrine as a Nasal
Decongestant* (March 19, 2024), *available at*: https://tinyurl.com/2jwfsh8m..........................7

## INTRODUCTION

These cases seek to override decades-old federal regulations approving phenylephrine—an over-the-counter medicine used to treat nasal congestion—as safe and effective and regulating how this medicine is sold, labeled, and marketed.  The FDA has for decades authorized the sale of phenylephrine and required Defendants to sell phenylephrine with statements that Plaintiffs now claim are false.  Plaintiffs do not allege that phenylephrine is dangerous, has hurt consumers, or presents any safety risk.  Instead, Plaintiffs accuse Defendants of engaging in false or misleading conduct by selling phenylephrine and marketing that medicine as a treatment for nasal congestion, as the FDA has authorized them to do.

Congress, however, has delegated to the FDA the authority to regulate the national drug marketplace.  The FDA determined phenylephrine effectively treats nasal congestion following a years-long process involving an expert advisory panel that included physicians and pharmacologists and multiple rounds of notice-and-comment rulemaking.  When it did so, the FDA required manufacturers and retailers selling medicine containing phenylephrine to "identif[y] the product as a 'nasal decongestant'" and state on the medicine's packaging that it, for example, "[t]emporarily relieves nasal congestion."  21 C.F.R. § 341.80(a), (b)(1).  Companies violate federal law if they do not comply with these requirements.  *See* 21 U.S.C. § 352(a)(1).

This Court should therefore dismiss all of Plaintiffs' state-law claims because federal law preempts Plaintiffs' attempt to use state law to attack efficacy claims that the FDA has required to be included on the products at issue.  To ensure national uniformity in over-the-counter drug labeling, Congress enacted an express preemption provision that bars plaintiffs from using state law to impose any requirement "that is different from or in addition to, or that is otherwise not identical with" federal law.  21 U.S.C. § 379r(a)(2).  That is exactly what Plaintiffs are seeking to

1

do here: use state law to hold Defendants liable for selling FDA-approved medicine, for an FDA-approved purpose, with FDA-regulated labeling. Section 379r prohibits such a result. Plaintiffs' claims also are barred by conflict preemption principles: federal law requires Defendants to state on their medicines' packaging that phenylephrine is a nasal decongestant, yet Plaintiffs claim state law prohibits Defendants from doing so.

Plaintiffs appear to acknowledge their claims are preempted. Trying to avoid preemption, the Initial Streamlined Complaint accuses some Defendants of violating RICO, even though none of the 99 complaints consolidated into this MDL includes a RICO claim. This last-ditch gambit does not keep Plaintiffs' claims alive for at least two reasons. *First*, none of the RICO Defendants sells their products directly to consumers, and so Plaintiffs lack statutory standing to sue them under RICO. *Second*, even if Plaintiffs were direct purchasers (they are not), their RICO claim is precluded by the Federal Food, Drug, and Cosmetic Act ("FDCA"), because Plaintiffs cannot use RICO to collaterally attack the FDA's determination that Defendants may lawfully market products that contain phenylephrine with the statements Plaintiffs claim are fraudulent here.

Allowing Plaintiffs' claims to proceed would have serious and substantial ramifications. It would clear the way for the judgment of lay juries to override the FDA's expert determinations about when medicine is safe and effective. It would also throw the door open for each of the 50 states to adopt 50 different approaches about when medicine is safe and effective and what information must be shared with consumers. In short, the uniform federal regulatory regime governing over-the-counter drugs created by Congress would be thrown into disarray. This Court should bring this litigation to an end.

## BACKGROUND

### A.    The Extensive Federal Regulatory Scheme for Over-The-Counter Drugs.

For decades, Congress has delegated regulatory authority for over-the-counter drugs to the

FDA, which devotes significant resources and brings substantial subject-matter expertise to regulating the market. Under the FDCA, "a new drug may not enter interstate commerce unless FDA determines that it is generally recognized as safe and effective . . . for the particular use described in its product labeling." *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 75 (2d Cir. 2013).

Beginning in 1972, the FDA "established FDA's 'monograph' system for regulating over-the-counter drugs."[1] *Id.* A monograph is a "detailed regulation . . . for each therapeutic class of OTC drug products." *Id.* The final monograph specifies the conditions under which a medicine may be sold, including setting acceptable doses, formulations, and labeling for covered medications. *See* 21 C.F.R. § 330.10(a)(9); *Nat. Res. Def. Council*, 710 F.3d at 75.

Congress granted the FDA nearly exclusive authority to enforce the FDCA's provisions and its implementing regulations. *See* 21 U.S.C. §§ 331-337a. An over-the-counter drug is "generally recognized as safe and effective and is not misbranded" if it complies with the "applicable monograph" and certain other federal regulations. 21 C.F.R. § 330.1. The converse is also true: a drug that fails to comply with the monograph is "liable to regulatory action" and violates federal law. *Id.* Congress further confirmed its approval of the FDA's historical use of the monograph process when it passed the CARES Act in 2020, at which point Congress "deemed to be generally recognized as safe and effective" drug products marketed in compliance with the final monograph. 21 U.S.C. § 355h(a)(1)(A)(i).

---

[1] The CARES Act overhauled the way the FDA administers the OTC monograph process by converting existing monograph regulations to administrative orders and replacing notice-and-comment rulemaking with an administrative order process. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 3851, 134 Stat. 281, 435 (2020). The previous process is summarized in this motion because the FDA published the final monograph for nasal decongestant products in 1994. *See infra* at 5.

Congress intended the FDA's judgment in matters relating to over-the-counter drugs to reign supreme. In 1997, Congress responded to the lack of uniformity resulting from 50 different state standards for over-the-counter drug labels by enacting the Food and Drug Administration Modernization Act, which contained an express preemption provision. *See* Pub. L. No. 105-115, § 412, 111 Stat. 2296, 2376 (1997). That provision declares that "no State or political subdivision of a State may establish or continue in effect any requirement" that relates to an over-the-counter drug that is "different from or in addition to, or that is otherwise not identical with" federal law. 21 U.S.C. § 379r(a)(2).

### B. After a Years-Long Monograph Process, the FDA Authorizes Phenylephrine as a Safe and Effective Nasal Decongestant.

The FDA's monograph process is rigorous. A monograph is developed only after the FDA has appointed an advisory panel of independent experts, which "review[s] the data" and reports its "conclusions and recommendations" to the FDA "with respect to the safety and effectiveness of the drugs." 21 C.F.R. § 330.10(a)(3).

The FDA began the monograph process for over-the-counter cold and cough medications in the 1970s. *See* 41 Fed. Reg. 38,312 (Sept. 9, 1976). The agency appointed an advisory panel of experts to evaluate the safety and efficacy of active ingredients used in cold and cough medications, including phenylephrine. *Id.* The panel, which included physicians and pharmacologists, thoroughly reviewed literature and data concerning the safety and efficacy of various ingredients. *Id.* at 38,319-418. The panel held more than 20 multi-day working meetings and considered presentations from more than 40 witnesses. *Id.* at 38,314.

After this rigorous review, the panel "conclude[d] that phenylephrine hydrochloride is safe and effective as an oral and as a topical nasal decongestant for OTC use." *Id.* at 38,399. In support, it cited "[c]linical studies [that] have documented the effectiveness of phenylephrine as an oral

nasal decongestant." *Id.* The FDA published the panel's findings in a notice of proposed rulemaking and solicited public comment. *See generally id*. at 38,312.

In 1985, the FDA published the tentative final monograph for OTC nasal decongestants. 50 Fed. Reg. 2,220 (Jan. 15, 1985). One public comment had "questioned the studies used by the Panel to substantiate the effectiveness of phenylephrine hydrochloride as an oral nasal decongestant" and "recommended that phenylephrine hydrochloride not be used as an oral nasal decongestant." *Id.* at 2,226. But the FDA did "not accept[]" the comment, finding instead "there is sufficient basis to determine [that] phenylephrine hydrochloride is generally recognized as effective for OTC use as an oral nasal decongestant." *Id.*

In 1994, the FDA published the final monograph for nasal decongestants, which continued to recognize phenylephrine as generally safe and effective. 59 Fed. Reg. 43,386, 43,408 (Aug. 23, 1994). The final monograph promulgated specific dosage, warning, and labeling regulations for medicine containing phenylephrine. *See id.* at 43,409-12 (codified at 21 C.F.R. § 341.80); *see also* 21 C.F.R. § 341.85 (labeling regulations for combination products, including those containing phenylephrine). Among other things, the label of a medicine with phenylephrine *must* (i) contain "the established name of the drug, if any"; (ii) "identif[y] the product as a 'nasal decongestant'"; and (iii) state, "For the temporary relief of nasal congestion" or "Temporarily relieves nasal congestion." 21 C.F.R. § 341.80(b)(1). The label "may" contain additional statements about the drug's efficacy, such as "For the temporary relief of [a] stuffy nose," "Decongests nasal passages," and "Temporarily restores freer breathing through the nose." *Id.* § 341.80(b)(2). These requirements apply both to medicine that contains only phenylephrine as well as combination cough-and-cold medicine that includes phenylephrine as one of several ingredients. *See* 21 C.F.R. § 341.85 (labeling regulations for combinations of active ingredients).

### C.  The FDA Continues to Recognize Phenylephrine as Safe and Effective.

In 2007, a group of pharmacists submitted a citizen petition to the FDA regarding phenylephrine.  *See* U.S. Food & Drug Admin., *NDAC Briefing Document: Oral Phenylephrine in the CCBA Monograph*, at 23, *available at*: https://tinyurl.com/2dk7248p.  That petition sought to increase the maximum dosage for patients over 12 years old and withdraw approval for patients younger than 12.  *Id.*  The FDA held an advisory committee meeting on the petition in late 2007, after which 11 of the 12 committee members voted to confirm that phenylephrine was effective at the monograph's dosing levels.  *Id.* at 23-30.  No changes were made to the final monograph.

In 2015, two of the petitioners from the unsuccessful 2007 citizen petition submitted another petition.  *Id.* at 8 & n.4.  This petition requested that the FDA reclassify oral phenylephrine as not generally recognized as safe and effective and remove it from the monograph.  *Id.* at 8.  In September 2023, the FDA's Non-prescription Drugs Advisory Committee—which is independent of the FDA and provides non-binding advice to the agency[2]—met to discuss the effectiveness of oral phenylephrine.  The advisory committee voted that oral phenylephrine is ineffective as a decongestant, but it did not raise any concerns about the medicine's safety.  *See generally id.*

Two days after the meeting, the FDA issued a press release to "clarif[y] results of [the] recent advisory committee meeting on oral phenylephrine."  U.S. Food & Drug Admin., *FDA clarifies results of recent advisory committee meeting on oral phenylephrine* (Sept. 14, 2023), *available at*: http://tinyurl.com/2tbhkvyf.  The FDA confirmed that "[a]dvisory committees provide independent advice and recommendations to FDA, but the agency makes the final

---

[2] *See* U.S. Food & Drug Admin., *Nonprescription Drugs Advisory Committee* (Feb. 16, 2023), *available at*: https://tinyurl.com/2s439zwk.

decision.  FDA will consider the input of this advisory committee, and the evidence, before taking any action on the status of oral phenylephrine." *Id.*

No changes have been made or proposed to the final monograph for nasal decongestants. As an FDA official recently reaffirmed, to date "the status of oral phenylephrine products remains the same – they are considered generally recognized as safe and effective as OTC nasal decongestants."  U.S. Food & Drug Admin., *The Current Status of Oral Phenylephrine as a Nasal Decongestant*, at 07:22 (March 19, 2024), *available at*: https://tinyurl.com/2jwfsh8m [hereinafter *Current Status of Phenylephrine*].  To make any changes, the FDA must follow an administrative order process.  *See* 21 U.S.C. § 355h(b)(2)(B)(ii).  "Only after FDA issues a final order" removing phenylephrine from the monograph "would manufacturers be required to reformulate or remove OTC monograph products containing oral phenylephrine."  *Current Status of Phenylephrine*, at 09:16.

### D.    Plaintiffs' Lawsuits.

Even though the FDA has recognized phenylephrine as a safe and effective treatment for nasal congestion for more than 50 years and has repeatedly and recently reaffirmed that conclusion, the advisory committee's vote triggered a slew of false advertising lawsuits against companies that manufacture and sell oral phenylephrine.  To date, 99 putative class actions have been filed and centralized in this MDL.  Plaintiffs have now filed an Initial Streamlined Complaint (ECF No. 200) that they acknowledge contains "sufficient representative examples of the conduct and claims that they allege to be wrongful."  ECF No. 204 at 3.

The Complaint does not claim that any Plaintiff in these cases suffered bodily harm or personal injury.  And no Plaintiff disputes that the medicines comply with the monograph.

Instead, the Complaint seeks to proceed on deception-based theories under state law, *see* Compl. ¶¶ 383-462, even though the monograph mandates or authorizes virtually all of the

statements that Plaintiffs challenge as false or misleading.  The gravamen of the Complaint is that it is deceptive for Defendants to "continue[] to market and sell PE Products as 'decongestants,'" *id.* ¶ 69, even though federal law *requires* PE products to be marketed as "nasal decongestant[s]," 21 C.F.R. § 341.80(a).  The Complaint further alleges that Defendants failed to "disclose to consumers that PE Products do not decongest," Compl. ¶ 73, even though federal law contains no such requirement and in fact requires companies to state the opposite—for example, that phenylephrine provides "temporary relief of nasal congestion," *see* 21 C.F.R. § 341.80(b)(1).  The Complaint also briefly takes issue with some marketing statements referencing the "maximum strength" of certain products, which the Complaint alleges is false because phenylephrine is ineffective.  *E.g.*, Compl. ¶ 68.

The purpose of the Initial Streamlined Complaint was to allow Defendants to raise a threshold federal preemption defense that "will, if such arguments prevail, resolve this litigation in its entirety."  ECF No. 197 at 2; *accord* ECF No. 204 at 3.  Perhaps recognizing that their claims face fatal preemption defenses, Plaintiffs added a federal RICO claim to that Complaint, *see* Compl. ¶¶ 463-521, even though none of the underlying complaints in the MDL asserted such a claim.  The RICO claim rests on the premise that some (but not all) Defendants formed a RICO enterprise with an industry trade association to allegedly defraud the FDA and the public about the effectiveness of phenylephrine.  *See id.* ¶¶ 85-130.  The crux of the purported fraud is that Defendants "assert in the press and to regulators that PE Products are effective," *id.* ¶ 88, even though an FDA official confirmed as recently as *March 2024* that PE products are "generally recognized as safe and effective as OTC nasal decongestants" and may be lawfully sold, *Current Status of Phenylephrine*, at 07:22.

## ARGUMENT

### I.    Federal Law Preempts Plaintiffs' State-Law Claims.

The Supremacy Clause "establishes that federal law 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of Any State to the Contrary notwithstanding.'" *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (quoting U.S. Const., Art. VI, cl. 2).  Where "state and federal law directly conflict, state law must give way" as preempted.  *Id.* (cleaned up).  "A defense of preemption is properly considered on a motion to dismiss."  *S & R Dev. Ests., LLC v. Town of Greenburgh, New York,* 336 F. Supp. 3d 300, 308 (S.D.N.Y. 2018).

The Supreme Court has identified several different types of preemption, two of which—"express" and "conflict" preemption—are relevant here.  *Murphy v. Nat. Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).  "Express" preemption focuses on statutory provisions enacted by Congress stating that certain state laws are preempted, and courts applying this type of preemption "do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."  *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (cleaned up).  "Conflict" preemption addresses "situations where compliance with both state and federal law is a physical impossibility, or . . . where the state law at issue stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (Cogan, J., sitting by designation) (cleaned up).  Both forms of preemption "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted."  *Murphy*, 584 U.S. at 477.

All of Plaintiffs' state-law claims are preempted under both of these preemption principles.  For nearly 30 years, the FDA's final monograph has recognized phenylephrine as an effective oral

treatment for nasal congestion and required that any medicine containing phenylephrine be labeled as a "nasal decongestant." This Court should therefore dismiss Plaintiffs' state-law claims, which attempt to use state law to override federal law expressly permitting Defendants to sell phenylephrine and regulating how the challenged products may be marketed.

### A.    Plaintiffs' State-Law Claims Are Expressly Preempted.

#### 1.    The FDCA preempts state-law claims that seek to impose requirements "different from or in addition to, or that [are] otherwise not identical with" federal law.

The FDCA contains an express preemption provision declaring that "no State or political subdivision of a State may establish or continue in effect any requirement" that relates to an over-the-counter drug "that is different from or in addition to, or that is otherwise not identical with" federal law. 21 U.S.C. § 379r(a). As its title indicates, this preemption provision was intended to create "National Uniformity for Nonprescription Drugs." *Id*. State-imposed requirements that are subject to express preemption under Section 379r include attempts to challenge the labeling and marketing of over-the-counter drugs under consumer protection statutes and through other common-law claims like those asserted in the Complaint. *See Goldstein v. Walmart, Inc.*, 637 F. Supp. 3d 95, 113 & n.7 (S.D.N.Y. 2022) (dismissing GBL and warranty claims); *see also Carter v. Novartis Consumer Health, Inc.*, 582 F. Supp. 2d 1271, 1283 (C.D. Cal. 2008) ("The touchstone of preemption under § 379r is the *effect* that a finding of liability on a particular claim would have on the Defendants, and not the particular common law or state law theory upon which that claim was brought.").

The Second Circuit has given this preemption language broad effect. In *Critcher v. L'Oreal USA, Inc.*, the Second Circuit considered whether the FDCA expressly preempted state-law claims that cosmetic labels deceptively misrepresented the amount of cream that consumers could extract from the products' containers. 959 F.3d 31, 33 (2d Cir. 2020). The Court explained

that Section 379s(a), a provision for cosmetics worded identically to Section 379r, "preempts not only those state laws that are in conflict with it (*i.e.*, any law that is 'different from' the FDCA), but also *any* state law that provides for labeling requirements that are not *exactly the same* as those set forth in the FDCA and its regulations." *Critcher*, 959 F.3d at 35-36. Those plaintiffs' state-law claims did not survive preemption because such claims would "impose labeling requirements on top of those already mandated in the FDCA and the regulations promulgated thereunder," which "is exactly what the FDCA does not permit." *Id.* at 36.

While the Second Circuit has not yet had the opportunity to apply *Critcher* to the FDCA's identically worded preemption provision for over-the-counter drugs, Section 379r has a similarly broad preemptive effect because "the normal rule of statutory interpretation [is] that identical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). Courts have thus correctly recognized that under Section 379r, "preemption is certainly appropriate when a state law prohibits labeling that is permitted under federal law. But it is *also* appropriate when a state law prohibits labeling that is *not prohibited* under federal law." *Bowling v. Johnson & Johnson*, 65 F. Supp. 3d 371, 375 (S.D.N.Y. 2014). "The standard, in other words, is not whether a state law actively undermines federal law. It is whether state law diverges from federal law *at all*." *Id.*; *see also Goldstein*, 637 F. Supp. 3d at 110 (plaintiffs' claims preempted when FDA had promulgated a "monograph [that] deals squarely with the issue"); *O'Connor v. Henkel Corp.*, 2015 WL 5922183, at *5 (E.D.N.Y. Sept. 22, 2015) ("[P]laintiffs can escape the preemptive force of the FDCA only if their claims seek to impose requirements that (1) are identical to those imposed by the FDCA, or (2) are outside the scope of the relevant federal requirements.").[3] Courts elsewhere have likewise confirmed that

---

[3] Prior to *Critcher*, some decisions suggested that the FDCA only sets a "floor upon which states can build additional protections." *Jovel v. i-Health, Inc.*, 2013 WL 5437065, at *6 (E.D.N.Y. Sept.

Section 379r broadly preempts "state-law advertising claims, provided the advertisements are based upon content approved by the FDA for a drug's labeling." *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 512 F. Supp. 3d 1278, 1296 (S.D. Fla. 2021); *see also Seale v. GSK Consumer Health, Inc.*, 2024 WL 1040854, at *6 n.5 (C.D. Cal. Feb. 27, 2024) ("[W]here Plaintiff's claims seek to alter or control Defendant's labeling of . . . products in ways not identical to the [monograph], the preemption provision in 21 U.S.C. § 379r(a) applies.").

Congress's decision to exempt certain state laws from Section 379r's requirements underscores the otherwise broad reach of this provision. *See* 21 U.S.C. § 379r(b)(1)(A) (permitting states to apply to the FDA for exemptions from preemption where a state law "protects an important public interest that would otherwise be unprotected"); *id.* § 379r(e) (exempting product liability actions). The availability of these exemptions underscores that Congress was aware that Section 379r generally would have broad preemptive effect and knew how to carve out exemptions when it wanted them.

The legislative history provides "[f]urther support for" a broad reading of Section 379r. *Sapienza v. Albertson's Companies, Inc.*, 2022 WL 17404919, at *3 (D. Mass. Dec. 2, 2022). The Senate Report accompanying the preemption provision observed that "[n]onprescription drugs are subject to careful and comprehensive regulation by the FDA," "[t]he conditions under which nonprescription drugs are considered safe and effective, for use by the lay consumer, are specified by FDA in nonprescription drug monographs," and "[t]he FDA authority in this area extends from manufacture through retail sale of these products." S. Rep. 105-43, 1997 WL 394244, at *64

---

27, 2013). This approach "cannot be right" in the wake of *Critcher*, which rejected such a narrow view of FDCA preemption. *Bimont v. Unilever U.S., Inc.*, 2015 WL 5256988, at *4 (S.D.N.Y. Sept. 9, 2015); *see also Critcher*, 959 F.3d at 37 (embracing broad reading of the FDCA by "draw[ing] on similar conclusions already reached by [] courts in this Circuit," including *Bimont*).

(1997). Congress therefore enacted Section 379r to create "one consistent national regulatory system." *Id.* at *65. Congress's intent was to ensure that "[n]o State or local government is permitted to impose different or additional requirements that relate to the subject matter covered by the three Federal laws as they apply to nonprescription drugs," including "requirements imposed on product manufacture or composition, labeling, advertising, or any other form of public notification or communication." *Id.* at *64.

### 2. Section 379r bars Plaintiffs' claims because they are inconsistent with the monograph.

Through the monograph process, the FDA has "promulgated rules regulating what must be included on labels" for over-the-counter medications "to avoid misleading consumers." *Critcher*, 959 F.3d at 38. "[T]he technical nature of such requirements—combined with Congress's broad, categorical statement of preemption in the FDCA," confirm that Plaintiffs' claims are preempted. *Id.*; *see also Solak v. Target Corp.*, 2023 WL 5806326, at *5 (N.D.N.Y. Sept. 7, 2023) ("monograph conditions are 'requirements' that have preemptive effect"). Thus, courts routinely dismiss claims as preempted under Section 379r when they challenge the substance of FDA-approved monograph representations. *See, e.g.*, *Singo v. Ricola USA, Inc.*, 2024 WL 196709, at *6 (S.D.N.Y. Jan. 18, 2024) (preempting claims seeking to impose state-law requirement different from monograph); *Bischoff v. Albertsons Cos., Inc.*, 2023 WL 4187494, at *6 (S.D.N.Y. June 26, 2023) (same); *Patora v. Vi-Jon, LLC*, 2023 WL 5610300, at *5 (S.D.N.Y. Aug. 30, 2023) (same).

The same result is compelled here. The FDA has declared phenylephrine an effective treatment for nasal congestion when taken orally at dosages prescribed by the monograph. *See supra* at 4-5. The Complaint nevertheless seeks to hold Defendants liable for representing that the products are "effective decongestants," *e.g.*, Compl. ¶ 2, even though the FDA *requires* products with phenylephrine to be marketed as "nasal decongestant[s]" and to state that they are indicated

"[f]or the temporary relief of nasal congestion" or "[t]emporarily relieves nasal congestion," 21 C.F.R. § 341.80(a), (b)(1). The Complaint also challenges other statements Defendants have made relating to phenylephrine's efficacy. *See, e.g.*, Compl. ¶ 68 (challenging statement that medicine "relieves 'sinus pressure' and 'sinus congestion'"), ¶ 73 (alleging Defendants "continued to make false representations to consumers that phenylephrine could be used to relieve nasal and sinus congestion"), ¶ 83 (challenging statement that medicine provides "effective . . . symptom relief"). But the FDA does not prohibit Defendants from making these statements, and it specifically authorizes Defendants to state, for example, "for the temporary relief of [a] stuffy nose," "[d]econgests nasal passages," "[t]emporarily restores freer breathing through the nose," and "temporarily relieves sinus congestion and pressure." *Id.* § 341.80(b)(2). The Complaint further seeks to force Defendants to "disclos[e] . . . that their PE Products do not decongest," Compl. ¶ 2, even though the monograph requires Defendants to state the opposite, *see* 21 C.F.R. § 341.80(a).

In short, all of Plaintiffs' claims are preempted because they seek to force Defendants either to delete FDA-authorized or FDA-required statements or to add language flatly inconsistent with the monograph. Such claims plainly seek to impose state-law requirements "different from or in addition to, or that [are] otherwise not identical with" federal law, and they suffer from the same defects that led other courts to dismiss other similar lawsuits on preemption grounds. For example, in *Lester v. CVS Pharmacy, Inc.*, 2024 WL 1312935 (S.D.N.Y. Mar. 27, 2024), the court held that Section 379r preempted claims seeking "to challenge the FDA's findings on the medical effectiveness of hydrogen peroxide," because "[l]itigating the scientific properties of hydrogen peroxide in an area where the FDA has already considered the evidence and authorized language is exactly the type of claim that is preempted by the FDCA." *Id.* at *5-6 (citing *Critcher*, 959 F.3d at 38). Similarly, in *Carter*, an FDA advisory panel concluded that cold and cough products were

unsafe and ineffective for children under six and recommended that the FDA prohibit their sale to that group. 582 F. Supp. 2d at 1284. As here, the panel's conclusion triggered litigation, but the case was dismissed as preempted because, also as here, it was "based entirely upon FDA-approved labeling and advertising," which "explain[ed] the conditions under which the FDA has determined that OTC cough and cold medicine will be safe and effective." *Id.* Any effort to impose liability on defendants "for complying with FDA regulations . . . constitute[s] perhaps the clearest example of state law requirements that differ from federal requirements." *Id.* at 1285.

Other courts have reached similar results when confronted with similar claims based on challenges to the FDA's efficacy determinations. *See Solak*, 2023 WL 5806326, at *5 (dismissing claims challenging hydrogen peroxide's efficacy in treating wounds because the FDA "ha[d] approved" hydrogen peroxide through a monograph "and has the authority to regulate the package labelling and marketing"); *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 784-85, 789 (E.D. Tex. 2008) (rejecting challenge to the effectiveness of lice medication that the FDA had approved in a monograph, when plaintiffs' claims were "based solely on the ideas that Defendants' drugs are *not* effective for the treatment of lice, and that Defendants are liable for representing that they *are* effective"). There is no reason to reach a different result here.

It is irrelevant whether the FDA specifically considered the exact language a manufacturer or retailer might use to market phenylephrine as a nasal decongestant. Claims seeking to dictate labeling language different from the FDA-approved monograph are preempted when the FDA addressed the general subject matter of a lawsuit, even though the agency did not expressly approve of the exact representation. *See, e.g.*, *Seale*, 2024 WL 1040854, at *6 (Section 379r preempted claims challenging labeling of cough medication because "[t]he FDA's monograph for cough and cold medications . . . already regulates the labeling of antitussive drug products . . . [and] does not

impose any requirement or prohibition like those that Plaintiff seeks"); *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 137 (E.D.N.Y. 2018) (claims preempted because "while the FDA may not have considered the exact language addressed . . . it had clearly addressed the substance of the claims at issue") (cleaned up); *Goldstein*, 637 F. Supp. 3d at 111-12 (similar).

Nor does it make any difference that Plaintiffs accuse Defendants of violating the general FDCA prohibition codified at 21 U.S.C. § 352(a)(1) of selling "misbranded" drugs with "labeling [that] is false or misleading." *See* Compl. ¶¶ 364-66. The FDA has declared that a decongestant, including phenylephrine, "is generally recognized as safe and effective and is not misbranded if it meets . . . each of the conditions contained in any applicable monograph." 21 C.F.R. § 330.1; *see also id.* § 341.1 (medicine that complies with monograph, as all Defendants' medicine does, "is generally recognized as safe and effective and is not misbranded"). Plaintiffs do not—and cannot—allege that phenylephrine fails to comply with the applicable monograph.

The Second Circuit in *Critcher* likewise refused to allow plaintiffs to rely on the "general requirement" that labeling not be false or misleading as a vehicle to "impose the particular labeling additions" plaintiffs sought. 959 F.3d at 38. Because the FDA had promulgated regulations providing "what information is necessary to avoid misleading consumers," plaintiffs could not impose *other* labeling requirements that have not been imposed by Congress or the FDA." *Id.*; *see also Seale*, 2024 WL 1040854, at *7 (rejecting argument because "if Plaintiff were permitted to proceed on the theory that her claims are parallel to § 352(a)(1), any finding of liability in her favor would conflict with preexisting regulations deeming Defendant's Antitussive drugs 'not misbranded'"); *Goldstein*, 637 F. Supp. 3d at 112 n.6 (finding same argument "not persuasive" because "taken to its extreme but logical limit, Plaintiff's argument would permit a state to restrict a manufacturer from using any language the state deemed to be false or misleading"). "With

16

respect to the labeling of OTC drugs, the whole point of section 379r is that it is not up to private litigants—or judges—to decide what is 'false or misleading.' It is up to the FDA." *Bowling*, 65 F. Supp. 3d at 377.

### B.    Plaintiffs' State-Law Claims Conflict with Federal Law and Are Preempted.

Plaintiffs' claims should also be dismissed under conflict preemption principles.    The presence of an "express pre-emption provision" in Section 379r "does not bar the ordinary working of conflict pre-emption principles." *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000); *see also Marentette*, 886 F.3d at 120 ("The express preemption provision does not weaken our conclusion that there is an implicit conflict . . . .").

State laws (including the common law) can conflict with federal law in at least one of two ways. *Marentette*, 886 F.3d at 117.  *First*, state laws are preempted "where it is impossible for a private party to comply with both state and federal requirements." *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013) (cleaned up).  *Second*, state laws are preempted where the challenged law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (cleaned up). Under both types of conflict preemption, congressional purpose and intent "is the ultimate touchstone." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  Both versions of conflict preemption apply here.

### 1.    Defendants cannot comply with federal law and Plaintiffs' purported state-law obligations.

It is impossible for Defendants to comply with their federal-law obligations in selling FDA-approved medicine containing phenylephrine and with the obligations Plaintiffs seek to impose through state law.  The FDA, through the monograph process, comprehensively regulates the labeling and sale of covered drugs, including phenylephrine. *See* 21 C.F.R. § 341.80; *see also id.*

17

§ 201.66(c), (d) (general requirements for the format and content of all over-the-counter drug labeling).  The monograph also requires the medicine to state the "purpose" (including the "pharmacological category") and the "use" (including the "indication") of the drug—which in this case is treating nasal congestion.  21 C.F.R. § 201.66(c)(3)-(4); *see also id.* § 341.80(b)(1).

Plaintiffs, by contrast, seek to use state law to prohibit Defendants from marketing medicine containing phenylephrine as a treatment for nasal congestion.  But if Defendants sold phenylephrine products *without* identifying them as treating nasal congestion, then Defendants would violate federal law.  Selling products "not in conformance with the monograph" means the products are "misbranded" and subject to enforcement action.  59 Fed. Reg. 43,386, 43,408 (Aug. 23, 1994); *see also* 21 C.F.R. § 330.1 (over-the-counter drug that "fails to conform to each of the conditions . . . in an applicable monograph is liable to regulatory action").  Doing so also subjects companies to civil and criminal penalties, including the possibility of fines, imprisonment, or both. *See* 21 U.S.C. § 333(a).

Because Defendants cannot do what Plaintiffs demand without violating federal law, Plaintiffs' claims conflict with federal law and are preempted.[4]  *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[A] court may not hold a civil defendant liable under state law for conduct federal law requires."); *Bartlett*, 570 U.S. at 486 (plaintiffs' claims preempted where "federal law forbids an action that state law requires"); *Frei v. Taro Pharms. U.S.A., Inc*,

---

[4] The Supreme Court's decision in *Wyeth v. Levine*, 555 U.S. 555 (2009), is not otherwise.  There, the Supreme Court rejected an impossibility preemption argument because the defendant—via a "changes being effected" regulation that applies to prescription drugs but not over-the-counter drugs—could have "unilaterally" added the warning label that was purportedly required by state law without violating any of its federal obligations.  *See* 555 U.S. at 571-73.  Unlike the defendant in *Wyeth*, Defendants cannot "independently" alter disclosures required by the monograph without violating federal law.  *Mensing*, 564 U.S. at 618, 620 (distinguishing *Wyeth* on this basis).  *Wyeth* also noted that there is no express preemption provision governing prescription drugs, which is not the case here.  *See Wyeth*, 555 U.S. at 574 ("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision . . . .").

443 F. Supp. 3d 456, 465-67 (S.D.N.Y. 2020) (claims preempted where defendants could not comply with purported state law obligations "without violating federal law").

It is no answer to say that Defendants can voluntarily stop selling phenylephrine altogether. The Supreme Court has repeatedly rejected "stop-selling" arguments as "incompatible" with the Supreme Court's preemption jurisprudence, which presumes "that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Bartlett*, 570 U.S. at 488 (preempting state-law design defect claims); *see also Mensing*, 564 U.S. at 618-26 (state-law disclosure claims preempted where it "was not lawful under federal law for the Manufacturers to do what state law required of them").  Following *Bartlett*, New York federal courts have consistently rejected "stop-selling" arguments.  *See, e.g.*, *Trisvan v. Heyman*, 305 F. Supp. 3d 381, 405 (E.D.N.Y. 2018) (rejecting argument that defendant could avoid impossibility with "outright ban" of sales of the product); *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 186 (S.D.N.Y. 2016) (dismissing on conflict preemption grounds claims challenging prescription medication).  This Court should as well.

### 2.    Plaintiffs' state-law claims impose obstacles to Congress's purposes.

Plaintiffs' state-law claims also conflict with federal law because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 567 U.S. at 406 (state law preempted under obstacle preemption), which sought to establish a uniform federal regulatory regime for over-the-counter medication.

*First*, permitting private plaintiffs to use state law to challenge the FDA's efficacy determinations would "disrupt what Congress intended to be a uniform—and federally-led— regulatory scheme." *Crichter*, 959 F.3d at 38.  Congress demonstrated it approved of the FDA's efficacy determinations made during the monograph process when it enacted the CARES Act in 2020, which reaffirmed that "[a] drug is deemed to be generally recognized as safe *and effective*"

if it complies with the applicable final monograph, as Defendants' phenylephrine-containing products do.  21 U.S.C. § 355h(a)(1)(A)(i) (emphasis added).  If Plaintiffs' claims are permitted to proceed, nothing would stop the 50 states from taking 50 different approaches to whether phenylephrine (or other ingredients in over-the-counter drugs) is effective and at what dosage levels, even though an expert federal agency, exercising congressionally-delegated authority, has answered that question in the monograph.  Not only would a state-by-state approach to efficacy determinations confuse consumers, but inefficiencies in creating different labels for different states could delay access to critical over-the-counter drugs and increase prices.  *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 452 (2005) ("50 different labeling regimes . . . would create significant inefficiencies for manufacturers"); *Zogenix, Inc. v. Patrick*, 2014 WL 1454696, at *2-3 (D. Mass. Apr. 15, 2014) (preempting state law banning sale of FDA-approved medication because if states "were able to countermand the FDA's determinations and substitute [their] own requirements, it would undermine the FDA's ability to make drugs available to promote and protect the public health").  As Congress has observed, "[d]ifferent or additional requirements [at] the State or local level can work against our national marketplace, confuse consumers, raise prices, undermine public confidence in our regulatory system and in products important to the public health, and result in divergent public health protection throughout the country."  S. Rep. 105-43 at *64.  Allowing such a situation would "lead precisely to the patchwork of inconsistent packaging regulations that Congress sought to prevent" in passing Section 379r.  *Goldstein*, 637 F. Supp. 3d at 113.

*Second*, allowing Plaintiffs' claims to proceed would clear the way for juries to second-guess the FDA's efficacy judgments, which "would undermine the regulations and monographs promulgated by the FDA."  *Singo*, 2024 WL 196709, at *6.  If Plaintiffs' claims proceeded to trial,

a jury would be asked to determine whether phenylephrine is an effective treatment for nasal congestion—even though the FDA has said for decades that it is. "Because the FDA alone can balance the potentially competing concerns of safety and effectiveness, common law and state law liability that is also premised on a product's safety and effectiveness can only upset that balance." *Carter*, 582 F. Supp. 2d at 1281. To "permit a jury to second-guess" FDA approval decisions and determine that those decisions "were inadequate under state law would displace the FDA's exclusive role and expertise." *Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 930-31 (5th Cir. 2006). As a result, manufacturers and consumers would be unable to rely on the FDA's regulatory decisions, and instead would receive conflicting efficacy information across different states. The FDCA was intended to avoid this result.

## II.    The RICO Claim Fails for at Least Two Independent Reasons.

"Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Gutterman v. Herzog*, 2020 WL 6728787, at *3 (E.D.N.Y. Nov. 16, 2020). For that reason, "courts have expressed skepticism toward civil RICO claims" because "plaintiffs wielding RICO almost always miss the mark." *Town of Islip v. Datre*, 245 F. Supp. 3d 397, 408 (E.D.N.Y. 2017). Plaintiffs' RICO claim here misses the mark for at least two reasons: (1) Plaintiffs did not directly purchase their products from any RICO Defendant, meaning the indirect purchaser rule bars their RICO claim, and (2) the FDCA precludes using RICO to collaterally attack the FDA's efficacy determination.

### A.    Plaintiffs Lack Statutory Standing to Assert the RICO Claim.

The indirect purchaser rule "leaves no question" that a RICO claim about retail purchases of over-the-counter products cannot be pursued against the manufacturers of those products. *In re Zantac (Ranitidine) Prods. Liability Litig.*, 546 F. Supp. 3d 1216, 1225 (S.D. Fla. 2021) (dismissing similar RICO claim). The RICO claim is only asserted against manufacturers, *see*

Compl. ¶ 86, and Plaintiffs do not—and cannot—allege that they bought their products from any of these Defendants.  Plaintiffs' RICO claim therefore is barred by the indirect purchaser rule.

The Supreme Court has held that "indirect purchasers who are two or more steps removed" from the defendant "in a distribution chain may not sue." *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019) (emphasis omitted).  A downstream (or "indirect") purchaser lacks standing to bring antitrust claims against manufacturers from whom they did not directly purchase.  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 726, 735-36 (1977).  In other words, "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A." *Apple*, 587 U.S. at 280.

Although it originated in the antitrust context, the indirect purchaser rule applies to civil RICO claims.  *See Sperber v. Boesky*, 849 F.2d 60, 64-65 (2d Cir. 1988) (observing that indirect consumer purchasers "probably cannot recover under RICO, just as they cannot recover under the anti-trust laws").  That is because "[e]xtending liability to everyone to whom an illegal price is passed would extend the chain of liability indefinitely." *Id.*  Since "Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws," *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992), the limitations the Supreme Court has enforced on standing to assert Sherman Act claims apply equally to RICO claims, *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004) ("[I]ndirect purchasers lack standing under RICO."); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) (applying "antitrust standing principles" to RICO); *Carter v. Berger*, 777 F.2d 1173, 1177 (7th Cir. 1985) ("*Illinois Brick* rule . . . applies to RICO, too."); *Humana, Inc. v. Biogen, Inc.*, 666 F. Supp. 3d 135, 141 (D. Mass. 2023) ("Every circuit to have considered the issue has held that the rule also applies to civil RICO actions."); *Zantac*, 546 F. Supp. 3d at 1221-24 (collecting cases).

Plaintiffs admit that they did not purchase the products from any RICO Defendant. Plaintiffs concede that "wholesalers and retailers [] purchased oral phenylephrine products" and that Plaintiffs "are the end purchasers."  Compl. ¶ 521; *see also id.* ¶¶ 133, 150, 165, 172, 178, 184, 192, 199, 206, 224, 269, 293, 300, 306, 313, 319, 327 (alleging purchases from various retailers, none of which are "RICO Defendants").  As in *Zantac*, because Plaintiffs "purchased OTC [products] from various retailers, not directly from Defendants," "[t]he bright-line indirect purchaser rule . . . is an unsurmountable hurdle for Plaintiffs."  546 F. Supp. 3d at 1226; *see also In re Insulin Pricing Litig.*, 2019 WL 643709, at *8-13 (D.N.J. Feb. 15, 2019) (consumers who purchased insulin products lacked standing to bring RICO claim against manufacturers).

It makes no difference that Plaintiffs allege that they "are the only harmed individuals or entities, and there are no other plaintiffs better suited or able to seek a remedy for the economic harms at issue here."  Compl. ¶ 521.  Courts do "not resolve what party was a direct purchaser by calculating exactly where the harm lay."  *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 92 (3d Cir. 2011); *see also Zantac*, 546 F. Supp. 3d at 1226.  Just as in *Zantac*, the RICO claim here should be dismissed with prejudice for lack of standing.  *Id.* at 1227.

### B.    The RICO Claim Is Precluded by the FDCA.

The doctrine of preclusion "concerns the alleged preclusion of a cause of action under one federal statute"—here, RICO—"by the provisions of another federal statute"—here, the FDCA.  *POM Wonderful v. Coca-Cola Co.*, 573 U.S. 102, 111 (2014).  Applying this doctrine, "[c]ourts in this Circuit have routinely precluded RICO claims where the alleged conduct is already covered by a more detailed federal statute."  *Palmer v. Trump Model Mgmt., LLC*, 175 F. Supp. 3d 103, 109 & n.14 (S.D.N.Y. 2016) (collecting cases); *see also Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 636 (2d Cir. 1989) (plaintiff could not sue under "ubiquitous RICO" because claims were "specifically covered within the confines of" another federal statute); *Poretsky v. Hirise*

23

*Eng'g, P.C.*, 2016 WL 5678880, at *3 (E.D.N.Y. Sept. 30, 2016) (federal statute "should apply to the preclusion of RICO, given that [it] is the more precisely drawn and detailed statute" (cleaned up)). Because the FDCA and the FDA's monographs specifically cover—and permit—the alleged conduct, *see supra* at 4-5, and because the FDCA is the detailed statutory scheme for regulation of over-the-counter medicine, whereas RICO is a general statute designed to deter organized crime, Plaintiffs' RICO claim is precluded.

Plaintiffs' RICO claim also falls squarely within the category of claims that the Supreme Court and the Second Circuit have said are precluded by the FDCA. *POM Wonderful* instructs that the FDCA precludes a claim under other federal statutes when the FDA has "made a policy judgment that is inconsistent with" the factual premise underlying the federal claim. 573 U.S. at 120. The Court distinguished that situation from the Lanham Act case before it, which—unlike here—was "not a case where a lawsuit is undermining an agency judgment." *Id*. The Supreme Court specifically cited "drug labels" as an example of an FDA policy judgment that could preclude claims under another federal statute. *Id.* at 116. The Second Circuit has since held that federal claims challenging "representations commensurate with information in an FDA label" were barred. *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63-64 (2d Cir. 2016). That "rule reflects proper 'deference to the expertise' of the FDA as the regulatory agency responsible for issuing the label by respecting the exhaustive process preceding the issuance of a label." *Id.* at 64; *see also Shepard v. Applebees's Int'l, Inc.*, 2010 WL 1418588, at *2 (D. Kan. Apr. 7, 2010) ("Where federal law preempts state common law claims, RICO claims which rely on the preempted state fraud claims to define predicate acts are similarly 'preempted' for lack of a better word."); *Jarman v. United Indus. Corp.*, 98 F. Supp. 2d 757, 766 (S.D. Miss. 2000) (dismissing RICO claim because "responsibility for regulating allowable representations by pesticide

24

manufacturers . . . is placed within the exclusive province of the EPA," and allowing RICO claims challenging that advertising "would obviously undermine the regulatory structure constructed by Congress").

Under *POM Wonderful* and *Apotex*, Plaintiffs' RICO claim is precluded for the same reason their state-law claims are preempted: Plaintiffs seek to second-guess the FDA's longstanding conclusion that phenylephrine is effective, and to punish Defendants for making statements consistent with that conclusion.    *See, e.g.*, Compl. ¶ 87 (RICO defendants "represent[ed] to consumers and regulators that PE Products are effective").   Plaintiffs cannot avoid preclusion by arguing that "the RICO Defendants" made "sham and fraudulent submissions" to the FDA, *id.* ¶ 501, because the Second Circuit has broadly rejected the use of RICO to allege federal regulators have been defrauded.[5]  *See Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21 (2d Cir. 1994) (dismissing RICO claims because "regulators who are intimately familiar with the industry," and not private parties, "are best situated to discover when regulated entities engage in fraud on the agency and to remedy the wrongdoing when the specter of fraud arises"); *see also Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 444 F. App'x 401, 410 n.4 (11th Cir. 2011) (Plaintiffs "may not rely on a . . . fraud-on-the-FDA theory of causation for [their] RICO claim").

## CONCLUSION

This Court should dismiss the Initial Streamlined Complaint with prejudice.

---

[5] Plaintiffs do not base their state-law claims on such a fraud-on-the-FDA theory, because any attempt to do so would be preempted by the principles in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 348 (2001) ("[T]he federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives.").

June 3, 2024

Respectfully Submitted,

*/s/ Andrew Soukup*
Andrew Soukup (*pro hac vice*)
Laura Flahive Wu
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
asoukup@cov.com
lflahivewu@cov.com

Cortlin H. Lannin (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000
clannin@cov.com

*Attorneys for Defendant The Procter & Gamble Company*

*/s/ Jay P. Lekfowitz*
Jay P. Lefkowitz. P.C.
Jacob M. Rae
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
lefkowitz@kirkland.com
jacob.rae@kirkland.com

Robyn E. Bladow (*pro hac vice*)
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

*Attorneys for Defendant Haleon US Holdings LLC*

/s/ Hannah Y. Chanoine
Hannah Y. Chanoine
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
hchanoine@omm.com

Amy J. Laurendeau (*pro hac vice*)
Emilie W. Hamilton
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
alaurendeau@omm.com
ehamilton@omm.com

*Attorneys for Defendant Johnson &
Johnson Consumer Inc.*

/s/ James L. Bernard
James L. Bernard
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3121
James.bernard@hoganlovells.com

Lauren S. Colton (*pro hac vice*)
HOGAN LOVELLS US LLP
100 International Drive, Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2733
Lauren.colton@hoganlovells.com

*Attorneys for Defendant RB Health (US)
LLC*

/s/ Cara D. Edwards
Cara D. Edwards
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Telephone: (212) 335-4714
cara.edwards@us.dlapiper.com

27

Christopher G. Campbell
DLA PIPER LLP (US)
1201 West Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone: (404) 736-7800
christopher.campbell@us.dlapiper.com

Christopher Young (*pro hac vice*)
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA 92121
Telephone: (619) 699-4748
christopher.young@us.dlapiper.com

*Attorneys for Defendant Bayer HealthCare,
LLC*

*/s/ Mark J. Lesko*
Mark J. Lesko
GREENBERG TRAURIG, LLP
900 Stewart Avenue, 5th Floor
Garden City, NY 11530
Telephone: (631) 994-2408
Mark.Lesko@gtlaw.com

Nilda Isidro
Dale Rose Goldstein
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Nilda.Isidro@gtlaw.com
GoldsteinD@gtlaw.com

Sara K. Thompson (*pro hac vice*)
GREENBERG TRAURIG, LLP
3333 Piedmont Rd NE
Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2392
Sara.Thompson@gtlaw.com

*Attorneys for Defendants CVS Pharmacy
Inc., Target Corporation, Walgreen Co., and
Walmart Inc.*

28